CARL A. BOY, JR., AND JAMES BOY, DOING BUSINESS AS CAROLINA AIRCRAFT COMPANY v. RIDDLE AIRLINES, INC., A CORPORATION.

(Filed 28 February, 1962.)

**Sales §§ 6, 14—— Evidence held sufficient to be submitted to the jury on question of seller's implied warranty of goods.**

Plaintiffs' evidence, considered in the light most favorable to them, tending to show that they purchased the fuselage and center section of an airplane for the purpose of constructing an airplane around the fuselage and center section for use in flight, that defendant seller had knowledge of said purpose, and that by reason of the seller's prior agreement with the Air Force when the seller purchased the property as surplus, a plane reconstructed from the fuselage and center section could not be licensed or flown, and that plaintiffs had no knowledge of such restrictions upon the use of the plane, *is held* sufficient to be submitted to the jury on the issue of defendant's implied warranty and breach thereof, even though the evidence fails to make out an express warranty as alleged in the complaint.

APPEAL by plaintiffs from *Williams, J.,* May Civil Term 1961 of DURHAM, docketed and argued as No. 668 at Fall Term 1961.

Plaintiffs, partners doing business as Carolina Aircraft Company, instituted this action February 17, 1959, to recover damages on account of defendant's alleged breach of express and implied warranties and misrepresentations in connection with the sale by defendant to plaintiffs for $5,000.00 of an airplane fuselage and center section.

Plaintiffs' allegations, summarized or quoted, are stated in the following (our numbering) paragraphs.

1. In October, 1958, plaintiffs, acting through James W. Boy, entered into the contract of sale with defendant and paid the purchase price. During the negotiations, it was stated repeatedly to defendant's officials that plaintiffs were acquiring the fuselage and center section for a particular purpose, namely, "to rebuild an airplane around the fuselage and center section and then sell the airplane either somewhere in the United States or in Latin America." Defendant expressly and impliedly warranted that the fuselage and center section could be rebuilt as an airplane and that the assembled airplane could be legally registered and flown in the United States and elsewhere.

2. On December 24, 1958, defendant executed and delivered to plaintiffs a bill of sale for a Curtiss C-46 aircraft fuselage and center section, described by the Serial No. AFM 44-77847-A. Thereafter, plaintiffs made arrangements "to rebuild an aircraft around the fuselage and center section," and located a prospective purchaser in Latin America "for the airplane when rebuilt" at the price of $31,500.00 plus transportation expenses.

3. Plaintiffs were informed, after receipt of said bill of sale, that the fuselage and center section comprised parts of a wrecked Air Force plane purchased by defendant as surplus property from the United States Air Force; that the aircraft fuselage and center section, "even when re-assembled and rebuilt into a complete aircraft," cannot be registered by the Federal Aviation Agency, or by any other agency of the United States Government; and that, without such registration, such rebuilt and reassembled aircraft cannot be flown in the United States or in any other country.

4. Prior to and at the time of the contract of sale, "defendant was well aware of the fact that the aircraft fuselage and center section, which it intended to deliver to the plaintiffs, was subject to legal restrictions which prevented its use for any flight purposes"; but defendant "at no time disclosed to the plaintiffs the existence of these restrictions." Defendant's officials "knowingly, both expressly and impliedly, misrepresented that the aircraft fuselage and center section had no legal restrictions which would prevent their being used for flight purposes as plaintiffs intended." Plaintiffs were induced to buy

and did buy the fuselage and center section in reliance on defendant's said warranties and misrepresentations.

5. The fuselage and center section "are almost worthless to the plaintiffs or to anyone else other than the defendant. By reason of their bulk and the expense of moving them, the fuselage and center section have no fair market value except as junk or scrap, in which form it is worth . . . about $100.00."

6. "By reason of the defendant's misrepresentations and the breaches of the defendant's expressed and implied warranties, and by reason also of the failure of the defendant to fulfill its contract to provide a fuselage and center section that could legally be used for flight purposes, the plaintiffs have been damaged in the sum of $12,500.00."

Answering, defendant denied all of plaintiffs' allegations relating to breach of warranties and misrepresentations. Defendant admitted it sold the fuselage and center section to plaintiffs; that it received the purchase price of $5,000.00; and that, in December, 1958, it gave plaintiffs a bill of sale therefor. Defendant also admitted the fuselage and center section was bought by it as surplus property from the United States Air Force; that it was purchased "as a part number and not as an aircraft with serial number"; that it cannot be registered by the Federal Aviation Agency or by any other agency of the United States Government; and that the fuselage and center section was subject to legal restrictions preventing its use for flight purposes. Defendant alleged that James W. Boy was fully informed and had knowledge of these facts.

Evidence was offered by plaintiffs and by defendant.

At the conclusion of all evidence, the court, granting defendant's motion therefor, entered judgment of involuntary nonsuit. Plaintiffs excepted and appealed.

*Everett, Everett & Everett for plaintiffs, appellants.*

*J. G. McKay, Jr., and Reade, Fuller, Newsom & Graham for defendant appellee.*

BOBBITT, J. The sole question is whether the evidence, when considered in the light most favorable to plaintiffs, was sufficient for submission to the jury.

Background facts, disclosed by plaintiffs' evidence, include the following: Plaintiffs, under the name of Carolina Aircraft Company, had been engaged since 1946 in the business of buying and selling airplanes, and in repairing and rebuilding airplanes for sale, with headquarters in Durham, North Carolina. They had bought and sold "in the neighborhood of 400 airplanes," including C-46 airplanes. They "sold air-

planes primarily in South America." Both plaintiffs were airline transport pilots. James W. Boy was "Chief Pilot for Peruvian Airlines, Tapsa," based in Lima, Peru.

The negotiations in October, 1958, leading up to the sale, were between plaintiff James W. Boy and James P. Garvey, defendant's Supervisor of Surplus Sales, at defendant's principal office and main base of operations at International Air Terminal at Miami, Florida. The "fuselage and center section," which had been purchased by defendant from the United States Air Force, was at defendant's facility in Macon, Georgia.

In their brief, plaintiffs assert: "The defendant has consistently taken the position that the C-46 aircraft fuselage and center section were restricted for flight purposes, but that the plaintiffs knew of this restriction." Referring to this statement, defendant, in its brief, says: "The appellee reiterates this position and endorses this statement."

Plaintiffs' evidence consists principally (1) of the testimony, by deposition, of James W. Boy, (2) of the testimony of Carl A. Boy, Jr., and (3) of documents and photographs. The deposition of James W. Boy was taken April 24, 1961, in Guayaquil, Ecuador. There was no cross-examination.

Defendant's evidence consists of the testimony of James P. Garvey, with whom James W. Boy negotiated the contract of sale, and of documents.

The testimony of James W. Boy is summarized or quoted in the following (our numbering) paragraphs:

1. In October, 1958, he saw "a wrecked C-46 outside of Riddle Airlines' main gate in Miami, Florida, and was told to talk with a Mr. Jim Garvey in regard to these parts." When he approached Garvey "about the parts," Garvey said, "Let me sell you a whole C-46," and he replied, "Tell me more." Garvey then read from a Riddle Airlines' interoffice memo "parts necessary to fly a C-46 at Macon, Georgia." He looked over the list and asked the price. Garvey told him defendant "wanted $10,000 for it" and gave him the memo. He said he would think about it and make an inspection of the aircraft. He and Garvey also discussed "the other C-46 parts" he had come "to see about."

2. He and Garvey negotiated over the price for the fuselage and center section at Macon for several days. He made an offer of $5,000.00 "which they accepted." To the best of his recollection, "this bill of sale was delivered when (he) handed them the check."

3. There was no discussion "of what (he) was going to do with the airplane." He approached Garvey, originally, with reference to "those parts outside of their (defendant's) door" at Miami. He did tell Garvey

what he was going to do with these parts, namely, "that (he) knew of an aircraft that had been wrecked and needed a nose section." He purchased no property from defendant "other than a Curtiss C-46 aircraft fuselage and center section" at Macon.

4. "With respect to any restrictions placed on rebuilding the fuselage and center section of a Curtiss C-46 aircraft into a complete plane, there was never any mention of any restrictions at any time." He was in Peru when he first learned there was a restriction "on the manner of their use." His brother (Carl A. Boy, Jr.) notified him "that he had applied for registration of the aircraft and had been refused by the FAA."

5. Prior to delivery of the bill of sale, Garvey advised him "that the wings to the aircraft were owned by another company and were also located at the site of the aircraft and that the aircraft was without engines." Garvey told him a repair company at Macon had given the owner of the wings "an estimate of $1,500 for the repair" thereof. Garvey estimated it would cost $10,000.00 to repair "the damaged belly" of the fuselage and center section.

6. Garvey's statements as to estimated costs of repairs were made "when (he) was, so to speak, chiseling Mr. Garvey over the price of the aircraft." Garvey "was telling (him) of its merits and how inexpensively and how cheap (he) could have a complete C-46 ready to go."

7. If there had been no restrictions on the use of the fuselage and center section "when (he) paid $5,000 for it, (he) got a good buy." The fuselage and center section, if restricted so that it could not be rebuilt for flight purposes, "would be of very little value."

8. He made arrangements "to rebuild the Curtiss C-46 aircraft fuselage and center section into a complete aircraft. (He) made a trip to Texas and located a pair of wings that were overhauled and ready to go. (He) contacted E. E. Jones of Ramsa Airlines and arranged to borrow the necessary equipment to repair the damage."

James W. Boy did not identify any bill of sale or other exhibit. There is no evidence he ever saw the fuselage and center section. Nothing in James W. Boy's testimony indicates he had any contact with Garvey or other agent of defendant except during said negotiations in October, 1958.

The "fuselage and center section" was altogether, not in sections. It included a nose section. Garvey, defendant's witness, testified this was "quite a big thing, includes the cockpit." Too, Garvey testified that James W. Boy said all he wanted was "the nose from the airplane," but that defendant was unwilling to "cannibalize" the fuselage and center section, that is, tear it apart and sell it "piece by piece"; and

that James W. Boy said he could "sell the rest of it to Charlotte Leasing or someone." However, James W. Boy did not so testify; and Garvey's testimony, unless favorable to plaintiffs, may not be considered in passing on defendant's motion for judgment of nonsuit.

The testimony of Carl A. Boy, Jr., is summarized or quoted in the following (our numbering) paragraphs.

1. He had no contacts with Garvey until January, 1959. In October, 1958, while in Durham, he received a telephone call from James W. Boy. In compliance with James W. Boy's request, he went to Macon the next day by airplane. There, in company with Mr. Gerber, Chief of Maintenance at defendant's Macon installation, he checked the fuselage and center section against the said memo (forwarded to him by James W. Boy) and otherwise. This memo had been prepared by Gerber. In addition to the fuselage and center section, Gerber showed him "one horizontal stabilizer, and a vertical fan, and elevator, and one aeron," then located in a hangar, and told him that "these were parts of this deal." He told Gerber plaintiffs would take the airplane to Peru where they had a customer for it.

2. After he reported his findings to James W. Boy, the $5,000.00 offer was made and accepted. James W. Boy left for Peru. Carl A. Boy, Jr., returned to Durham.

3. In December, 1958, James W. Boy was in Miami. He then received from defendant a bill of sale dated December 24, 1958, which referred to a sale made by defendant to plaintiffs on October 29, 1958, and another or other documents, which he forwarded to Carl A. Boy, Jr. Carl A. Boy, Jr., with these documents, attempted to obtain an FAA registration number but was unable to do so. In January, 1959, he contacted Mr. Thompson, defendant's Executive Vice-President and Treasurer, seeking his assistance. He was advised by Mr. Thompson that "when (defendant) purchased the airplane from the Air Force, it was with the clear understanding that it was not to be flown"; that defendant had bought it for a special purpose, namely, to use the parts or certain parts in rebuilding an airplane; that it "would be breaking faith with the Air Force for him to go back and ask them at this date for papers that would allow us to fly the airplane"; and that, "(i)f anybody in this organization sold you that airplane and didn't tell you it was restricted, or had a restricted title, then we'll get rid of them and we'll give you your money back."

4. In a conference with Thompson, Garvey and others, Garvey stated he told James W. Boy when he bought the airplane that it had a restricted title and could not be flown. Thereupon, Thompson stated he would have to stand by Garvey and plaintiffs would have to sue.

5. "Except for flying, the only way the aircraft fuselage and center

section could be transported overland across the United States, or anywhere else for that matter, would be to disassemble it, which would make the cost prohibitive." To a junk dealer in Macon, the fuselage and center section would be worth about $250.00.

6. ". . . it would cost us approximately $19,000 to buy the parts and labor for installing the parts to make it ferryable." Plaintiffs had a purchaser for the reconstructed plane at the price of $31,000.00 plus transportation charges provided they could deliver it in Lima, Peru, "within 90 days from the first of the year."

It is unnecessary to review the evidence with reference to plaintiffs' prospective purchaser in South America. Our inquiry is to determine whether the evidence was sufficient for submission to the jury in respect of whether plaintiffs are entitled to recover, not to determine the measure or amount of damages plaintiffs are entitled to recover.

It is here noted that Garvey testified: "In order to fly the aircraft fuselage and center section located at Macon to Miami you would have to have a ferry permit." Again: "To get one (ferry permit) it would be required to have an FAA number." Again: "You could not get an FAA number if the plane was restricted so that it could not be flown."

Decision depends largely upon the testimony of James W. Boy. As indicated above, James W. Boy's testimony does not support plaintiffs' allegations that, in the negotiations, "the plaintiffs stated repeatedly to the officials of the defendant" that the particular purpose for which they were acquiring the fuselage and center section was "to rebuild an airplane around the fuselage and center section and then sell the airplane either somewhere in the United States or in Latin America." Moreover, plaintiffs' evidence discloses clearly that plaintiffs, at the time the sale was made, knew the fuselage and center section "comprised parts of a wrecked Air Force plane." Too, contrary to plaintiffs' allegation that defendant's officials "knowingly, both expressly and impliedly, misrepresented that the aircraft fuselage and center section had no legal restrictions which would prevent their being used for flight purposes as plaintiffs intended," James W. Boy testified: ". . . there was never any mention of any restrictions at any time."

"The Uniform Sales Act provides that 'any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon.' Williston on Sales (Revised Edition), section 194. Our Legislature has not incorporated the Uniform Sales Act in our statutory law, but the accuracy of the lucid and succinct definition of an express

warranty embodied in the Act is fully supported by repeated decisions of this Court." *Potter v. Supply Co.,* 230 N.C. 1, 7, 51 S.E. 2d 908.

The bill of sale executed by defendant under date of December 24, 1958, provides: "For and in consideration of $10 & OVC the undersigned owner of the full legal and beneficial title of the aircraft described as follows: AIRCRAFT MAKE AND MODEL. Curtiss C-46 (Fuselage & center section only). SERIAL NO. AFM 44-77847-A, REGISTRATION MARK ........ does this 29 day of October 1958 hereby sell, grant, transfer, and deliver all of his right, title and interest in and to such aircraft unto: Carolina Aircraft, P. O. Box 365, West Durham, North Carolina, and to its executors, administrators, and assigns, to have and to hold singularly the said aircraft forever, and certifies that same is not subject to any mortgage or other encumbrance except TYPE OF ENCUMBRANCE NONE."

There was evidence that the bill of sale executed December 24, 1958, was on a form ordinarily used for the sale and transfer of a complete aircraft. Plaintiffs contend the references in the bill of sale to the "aircraft" and to "SERIAL NO. AFM 44-77847-A" constitute an express warranty as alleged. This contention is without merit. It plainly appears from this bill of sale that defendant sold to plaintiffs the "Fuselage & center section only," a fact well known to plaintiffs; and the serial number merely denotes the aircraft of which the fuselage and center section was once a part. Moreover, we think the provision, "TYPE OF ENCUMBRANCE NONE," indicates there was no mortgage or other lien on the fuselage and center section.

In our opinion, the evidence was insufficient to support a finding that defendant expressly warranted that there were no restrictions that would prevent an aircraft built around the fuselage and center section from being legally flown.

However, we think the evidence, when considered in the light most favorable to plaintiffs, is sufficient to support a finding that the purchase was made by plaintiffs for the particular purpose of constructing an airplane around the fuselage and center section for use in flight and that defendant had knowledge of plaintiffs' said particular purpose. The testimony of James W. Boy that he did not tell Garvey "what (he) was going to do with the airplane," when considered in context, would seem to imply that he did not tell Garvey whether the reconstructed plane was to be sold or used as a flyable aircraft. Certainly, this inference is permissible.

"When a buyer purchases goods for a particular purpose known to the seller and relies on the skill, judgment, or experience of the seller for the suitability of the goods for that purpose, the seller impliedly warrants that the goods are reasonably fit for the contemplated pur-

pose, and is liable to the buyer for any damages proximately resulting to him from the breach of this warranty." *Stokes v. Edwards,* 230 N.C. 306, 310, 52 S.E. 2d 797; 46 Am. Jur., Sales § 346 *et seq.;* 77 C.J.S., Sales § 325; Williston on Sales, Revised Edition, Vol. 1, § 235; *Berger v. E. Berger & Co.* (Fla.), 80 So. 296.

Plaintiffs make no contention they relied on the skill, judgment or experience of defendant. On the contrary, they relied upon the full and careful inspection made by Carl A. Boy, Jr. Plaintiffs make no contention there was any defect of such nature that an aircraft could not be constructed around the fuselage and center section and flown. On the contrary, they contend they bought the fuselage and center section solely because it was suitable for such use.

The evidence, when considered in the light most favorable to plaintiffs, tends to show plaintiffs were unable to obtain an FAA registration number and authority to fly an aircraft constructed around the fuselage and center section; that their inability to do so resulted from the fact that defendant, when it purchased the fuselage and center section from the Air Force in a negotiated sale, expressly agreed it would not be used for such purpose or flown; and that plaintiffs had no knowledge or notice of this limitation upon the use of the fuselage and center section until January, 1959. Thus, according to plaintiff's evidence, the limitation as to use derives from defendant's said agreement, not from any statute or regulation of the FAA or other governmental agency.

No decision dealing with a similar factual situation has come to our attention. The precise question seems to be one of first impression. However, we are mindful of this statement by *Connor, J.,* in *Swift & Co. v. Aydlett,* 192 N.C. 330, 334, 135 S.E. 141: "The doctrine of implied warranty in the sale of personal property is too well established in this jurisdiction now to be drawn in question. It should be extended rather than restricted. (Citations) The harshness of the common-law rule of *caveat emptor,* when strictly applied, makes it inconsistent with the principles upon which modern trade and commerce are conducted; the doctrine of implied warranty is more in accord with the principle that 'honesty is the best policy,' and that both vendor and vendee, by fair exchange of values, profit by a sale."

Under the circumstances here considered, we are of opinion, and so decide, that, if the purchase was made by plaintiffs for the particular purpose of constructing an airplane around the fuselage and center section for use in flight and defendant had knowledge of plaintiffs' said particular purpose, defendant, in making the sale, impliedly warranted that the fuselage and center section was free from restrictions imposed thereon by any agreement made by defendant

whereby its use for such purpose was prohibited. In this view, the evidence was sufficient to require submission to the jury.

Having reached the conclusion the evidence was sufficient to require submission to the jury on the issues relating to the alleged breach of implied warranty, we do not pass upon whether plaintiffs' allegations and evidence were sufficient to require submission as to issues appropriate, upon legal principles stated in *Brooks v. Construction Co.*, 253 N.C. 214, 116 S.E. 2d 454, in an action for fraud and deceit.

On the ground stated, the judgment of involuntary nonsuit is reversed.

Reversed.